107 F.3d 1436
 133 Lab.Cas. P 33,520, 3 Wage & Hour Cas.2d
(BNA) 1413,
97 Cal. Daily Op. Serv. 1686,
97 Cal. Daily Op. Serv. 3190,
97 Daily Journal D.A.R. 3157,
97 Daily Journal D.A.R. 5587
 Teofanie M. MAGANA, Plaintiff-Appellant,
v.
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS; Isamu J.
Abraham, personally and in his capacity as Secretary of the
Department of Public Health and Environmental Services;
Jose Chong, personally, Defendants-Appellees.
 No. 95-16120.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 11, 1996.
Decided March 6, 1997.
As Amended May 1, 1997.
 
 G. Anthony Long, Long & Brown, Saipan, MP, for plaintiff-appellant.
 Robert Dunlap, Assistant Attorney General, Saipan, MP, for defendants-appellees.
 Appeal from the United States District Court for the Northern Mariana Islands, Alex R. Munson, Chief Judge, Presiding. D.C. No. CV-94-00028-ARM.
 Before: BROWNING, ALDISERT,* and BRUNETTI, Circuit Judges.
 OPINION
 ALDISERT, Circuit Judge:
 
 
 1
 Other substantial issues are presented in this appeal by Teofanie M. Magana from a judgment entered in favor of the Commonwealth of the Northern Mariana Islands ("Commonwealth" or "CNMI") and two individual officials, but the major question for decision is whether a litigant has the right to bring an action for money damages against the Commonwealth directly under the Fourteenth Amendment without a congressionally created cause of action. The District Court of the Northern Mariana Islands determined that Appellant had no such right and she appeals.
 
 
 2
 Appellant filed claims against Isamu J. Abraham, Secretary of the Department of Public Health and Environmental Services, and Jose Chong, the department's director, under statutorily created remedies for violations of the U.S. Constitution, federal and Commonwealth labor laws and federal civil rights acts. In addition to suing these individuals, she sued the Commonwealth directly under the Fourteenth Amendment. The dispute concerns an employment relationship between Magana and the Commonwealth, which formerly employed her at a government-operated health center. Appellant claims the Commonwealth failed to pay correct overtime payments and discriminated against Filipino nurses on the basis of race and national origin.
 
 
 3
 The district court had jurisdiction under 48 U.S.C. § 1694 and 28 U.S.C. §§ 1331 and 1332. This court has jurisdiction pursuant to 48 U.S.C. § 1694(c) and 28 U.S.C. § 1291. The appeal was timely filed under Rule 4(a), Federal Rules of Appellate Procedure.
 
 
 4
 In addition to the claim brought directly under the Fourteenth Amendment, this appeal requires us to decide a number of other questions: whether the district court erred in concluding that the Commonwealth was not required to compensate Magana for overtime work under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et. seq., or the Foreign Contract Workers Law, 3 C.M.C. § 4411 et seq., because she is a professional employee and, therefore, exempt from the overtime provisions of those acts; and whether the court erred in granting Appellees' motion for summary judgment on Appellant's claims under 42 U.S.C. §§ 1981 and 1983.
 
 
 5
 We review de novo district court decisions granting or denying cross motions for summary judgment. Equal Employment Opportunity Comm'n v. Maricopa County Community College Dist., 736 F.2d 510, 512-513 (9th Cir.1984); Lindsey v. Shalmy, 29 F.3d 1382, 1384 (9th Cir.1994). We review de novo district court decisions regarding exemptions to the Fair Labor Standards Act. Abshire v. County of Kern, 908 F.2d 483, 486 (9th Cir.1990).
 
 I.
 
 6
 Appellant brought a claim for money damages against the Commonwealth of the Northern Mariana Islands solely on the basis of the Fourteenth Amendment. She contends that the Commonwealth engaged in employment-discrimination practices that offend protections assured by that amendment. The absence of any remedial statute authorizing a direct action under the Fourteenth Amendment raises unusual issues, given the unique status of the Commonwealth. Conceding that such a claim could not be made against a state because of the Eleventh Amendment immunity afforded states, Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 907-08, 79 L.Ed.2d 67 (1984), Appellant anchors her argument on the premise that the CNMI does not have such immunity. Fleming v. Department of Public Safety, 837 F.2d 401, 405 (9th Cir.1988) (Eleventh Amendment does not apply to the CNMI because it is conspicuously absent from the provisions of the U.S. Constitution deemed applicable to the CNMI under § 501(a) of the Covenant establishing a union between the U.S. and Commonwealth).[1]
 
 
 7
 Appellant argues that because the Commonwealth may not assert an Eleventh Amendment defense, she is somehow empowered to bring a Fourteenth Amendment direct action against the CNMI for money damages. Before evaluating the significance of the presence or absence of an Eleventh Amendment affirmative defense, we must inquire whether Appellant is entitled to bring such a claim under the Fourteenth Amendment. To start this inquiry, we must understand the special relationship between the CNMI and the United States.
 
 A.
 
 8
 In 1976, the Northern Mariana Islands and the United States entered into the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America. Act of March 24, 1976, Pub.L. No. 94-241, 1976 U.S.C.C.A.N. (90 Stat.) 263. The Covenant and the CNMI constitution became effective on January 9, 1978, at which time the people of that territory became self governing. Temengil v. Trust Territory of the Pacific Islands, 881 F.2d 647, 650 (9th Cir.1989).
 
 
 9
 Neither the Covenant nor the CNMI constitution expressly vests jurisdiction in the District Court of the Northern Mariana Islands over an action for money damages against the Commonwealth brought directly under the Fourteenth Amendment. The Covenant abounds in specificity. Thus, Section 501(a) provides:
 
 
 10
 To the extent that they are not applicable of their own force, the following provisions of the Constitution of the United States will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States: Article I, Section 9, Clauses 2, 3, and 8; Article I, Section 10, Clauses 1 and 3; Article IV, Section 1 and Section 2, Clauses 1 and 2; Amendments 1 through 9, inclusive; Amendment 13; Amendment 14, Section 1; Amendment 15; Amendment 19; and Amendment 26; provided, however, that neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law. Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands, will be applicable within the Northern Mariana Islands only with approval of the Government of the Northern Mariana Islands and of the Government of the United States.
 
 
 11
 90 Stat. at 267 (emphasis added).
 
 
 12
 Noteworthy is that the Covenant's list of provisions applicable to the CNMI includes the Fifth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Equally noteworthy is that all provisions of the Constitution are not included in the list. For example, the Commerce Clause (Article I, Section 8, Clause 3), the Territorial Clause (Article IV, Section 3, Clause 2) and the Supremacy Clause (Article VI, Clause 2) are omitted from Section 501.
 
 
 13
 Section 502 of the Covenant provides that the laws of the United States that are in existence at the time the Covenant is adopted and generally applicable to Guam and the states are also applicable to the CNMI. However, Section 503 of the Covenant provides that certain laws are not applicable. In the posture of this case, the CNMI has not challenged the applicability of the FLSA to Appellant's claim; and 42 U.S.C. §§ 1981 and 1983 were made applicable to the Commonwealth through Section 502 of the Covenant. Temengil, 881 F.2d at 651 (citing Fleming, 837 F.2d at 404-405 (9th Cir.1988)).
 
 
 14
 With respect to future legislative enactments, Section 105 of the Covenant authorizes the United States to "enact legislation in accordance with its constitutional processes which will be applicable to the Northern Mariana Islands." 90 Stat. at 264. To further the goals of self-governance, the Covenant provides that Articles I, II, and III and Sections 501 and 805 of the Covenant cannot be modified without mutual consultation and agreement between the CNMI and the United States government. A & E Pacific Const. Co. v. Saipan Stevedore Co., 888 F.2d 68, 71 (9th Cir.1989). As this court has previously stated:
 
 
 15
 That Congress has the power to pass legislation with respect to the CNMI that it would not pass with respect to the states is plain. Having recognized that the potential scope of power over the CNMI would be greater than that over the states, Section 105 requires that Congress specifically identify the CNMI in cases where such legislation is not equally applicable to the states. As the Marianas Political Status Commission ("MPSC") explained in its contemporaneous analysis of the Covenant, this requirement is to ensure that Congress will exercise its legislative powers "purposefully, after taking into account the particular circumstances existing in the Northern Marianas."
 
 
 16
 U.S. Ex Rel. Richards v. De Leon Guerrero, 4 F.3d 749, 754 (9th Cir.1993) (citing Marianas Political Status Commission, Section-by-Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands 15 (1975)).
 
 
 17
 The foregoing analysis compels the following corollary observations:
 
 
 18
 Section 501 of the Covenant did not vest any power or authority in the District Court for the Northern Mariana Islands not already possessed by the courts in "the several States" and, therefore, no authority exists to entertain suits brought directly under the Fourteenth Amendment against the CNMI because Congress has not authorized such suits against the several states;
 
 
 19
 Section 105 grants Congress the power to enact special legislation regarding the Fourteenth Amendment that could affect only the CNMI and not the several states, yet Congress has not exercised such power; and, more precisely on point,
 
 
 20
 Congress has the power to authorize actions for monetary damages against the CNMI brought directly under the Fourteenth Amendment, but has refused to exercise such power despite the absence of the Eleventh Amendment immunity constraints applicable only to the states.
 
 
 21
 The federal courts have neither the legislative powers granted to Congress in the Covenant, nor the Fourteenth Amendment enforcement powers granted to Congress in Section 5 of that amendment. Therefore, we cannot find authority in either the Covenant or any specific statutory authorization to recognize a claim for monetary damages brought against the CNMI directly under the Fourteenth Amendment.
 
 B.
 
 22
 Beyond the absence of express authorization in the Covenant, the CNMI constitution and U.S. federal statutes, there is another formidable obstacle to asserting jurisdiction over claims brought directly under the Fourteenth Amendment. That obstacle is the venerable concept that "[f]ederal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." Bender v. Williamsport Area School Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (emphasis added). See also Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982) ("Federal courts are courts of limited jurisdiction. The character of the controversies over which federal judicial authority may extend are delineated in Art. III, § 2, cl. 1. Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction."); Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934) ("[That] which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which [a federal] statute has defined.").
 
 
 23
 The necessity of a statutory basis for any remedy provided by the lower federal courts is demonstrated by the Eighteenth and Nineteenth Century development of federal lower court jurisdiction. When the Fourteenth Amendment was adopted in 1868, federal trial courts possessed only the subject-matter jurisdiction conferred by the First Judiciary Act of September 24, 1789. That Act established primarily diversity jurisdiction. Accordingly, until the Act of March 3, 1875, "the lower federal courts were, in the main, designed as protection to citizens litigating outside of their own states and thereby exposed to the threatened prejudice of unfriendly tribunals. Barring admiralty jurisdiction, the federal courts were subsidiary courts. The Act of 1875 marks a revolution in their function." Felix Frankfurter and James M. Landis, The Business of the Supreme Court: A Study in the Federal Judicial System 64 (1927).
 
 
 24
 In the Act of March 3, 1875, Congress gave federal courts the vast range of power that had laid dormant since 1789. Id. at 65. That Act provided:
 
 
 25
 That the circuit courts of the United States shall have original cognizance ... of all suits ... arising under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority....
 
 
 26
 Act of March 3, 1875, c. 137, § 1, 18 Stat. at L. 470. The statute remains substantially unchanged and now appears in its familiar form:
 
 
 27
 The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.
 
 
 28
 28 U.S.C. § 1331.
 
 
 29
 The foregoing historical snippet demonstrates that when the Fourteenth Amendment was adopted in 1868, federal trial courts lacked the power to entertain claims for money damages brought solely under that amendment against anyone, any entity or any state. Nothing in the history of the amendment's adoption or of statutes granting federal remedies supports the proposition that Congress and the several states ratifying the Fourteenth Amendment intended it to be self-executing so as to provide a direct action for money damages.
 
 
 30
 Appellant also cannot find support for her claim in the Civil Rights Acts enacted during the Reconstruction period that followed the adoption of the Fourteenth Amendment in 1868. Indeed, the critical landmark legislation of that era, the Act of April 20, 1871, cuts squarely against Appellant's contention. That legislation created a remedial statute to process claims alleging violations of the Fourteenth Amendment and specifically described its purpose in the title:
 
 
 31
 An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States and other Purposes.
 
 
 32
 This was the statute in which Congress authorized courts to entertain civil actions against any "person, who, under color of any Statute, ordinance, regulation, custom, or usage, of any State or Territory," deprived any party of rights assured by the Fourteenth Amendment (or any other provision of the Constitution or a federal statute). R.S. § 1979, Act of April 20, 1871, c. 22, § 1, 17 Stat 13.[2] Section 1979 became § 1 of the Ku Klux Klan Act, subsequently known as the Civil Rights Act of 1871, and now known as 42 U.S.C. § 1983.[3] Section 1983 is, therefore, the modern-day statute "to enforce the Provisions of the Fourteenth Amendment to the Constitution."
 
 
 33
 The very language of the Fourteenth Amendment indicates Congress did not intend it to be self-enforcing. Section 5 provides: "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Moreover, if the amendment were self-enforcing, as Appellant claims, the Civil Rights Act of 1871 enacted to enforce the provisions of the Fourteenth Amendment would not have been necessary. In the landmark case of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), overruled on other grounds, Monell v. Department of Soc. Serv., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Court made clear the necessity for § 1983 as the statutory vehicle for bringing claims under the Fourteenth Amendment:
 
 
 34
 It was one of the means whereby Congress exercised the power vested in it by § 5 of the Fourteenth Amendment to enforce the provisions of that Amendment. Senator Edmunds, Chairman of the Senate Committee on the Judiciary, said concerning this section:
 
 
 35
 "The first section [§ 1983] is one that I believe nobody objects to, as defining the rights secured by the Constitution of the United States when they are assailed by any State law or under color of any State law, and it is merely carrying out the principles of the ... Fourteenth Amendment."
 
 
 36
 Id. at 171, 81 S.Ct. at 475 (footnotes omitted). See also Ngiraingas v. Sanchez, 495 U.S. 182, 187, 110 S.Ct. 1737, 1740, 109 L.Ed.2d 163 (1990) ("Section 1983 was originally enacted as § 1 of the Civil Rights Act of 1871. The Act was enacted for the purpose of enforcing the provisions of the Fourteenth Amendment."); Quern v. Jordan 440 U.S. 332, 354, 99 S.Ct. 1139, 1152, 59 L.Ed.2d 358 (Brennan, J., concurring) (1979).
 
 
 37
 We are driven inexorably to the conclusion that to claim money damages for violations of Fourteenth Amendment protections, litigants are limited to statutorily authorized relief. A leading commentator has summarized the prevailing legal precepts:
 
 
 38
 The Constitution (Article 3) prescribes what Congress can do. The statute prescribes what the courts can do. If authority is found in a statute but not in the Constitution, the statute is unconstitutional. If authority is found in the Constitution but not in a statute, the jurisdiction does not exist because Congress has not conferred it upon the courts.
 
 
 39
 Ray Forrester, The Nature of a "Federal Question", 16 Tulane L.Rev. 363, n.4 (1942).[4]
 
 C.
 
 40
 It is against this backdrop that we examine Appellant's arguments offered in support of her contention that a direct action under the Fourteenth Amendment may be brought against the Commonwealth for money damages. She begins by conceding that Territories, such as Guam and the CNMI, are not "persons" within the meaning of § 1983 and cannot be held liable under that statute. See Ngiraingas, 495 U.S. at 191-192, 110 S.Ct. at 1742-1743; DeNieva, 966 F.2d at 483. Thus, Appellant argues that because she has no direct remedy against the CNMI under § 1983, she should be entitled to bring a direct action under the Fourteenth Amendment. She contends such an action should be permitted in this case because the CNMI, unlike the states, is not entitled to the Eleventh Amendment immunity that bars suits in federal court for money damages against a "State." Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 907-08, 79 L.Ed.2d 67 (1984); Fleming, 837 F.2d at 405-406.
 
 
 41
 In logical form Appellant's premises do not provide logical support for her desired conclusion, as the following reiteration of her syllogistic argument demonstrates: the CNMI is not a "person" and, thus, cannot be sued under § 1983; the Eleventh Amendment is not a bar to suits against the CNMI; therefore, claimants have a direct action under the Fourteenth Amendment against the CNMI for money damages. A comment by Lord Devlin seems appropriate here: "I confess that I approach the investigation of this legal proposition with a prejudice in favor of the idea that there may be a flaw in the argument somewhere." Clearly the argument is a classic non sequitur and commits the fallacy of the consequent because the suggested conclusion does not follow logically from given premises or any antecedent statements.
 
 
 42
 That Appellant may not recover against the Commonwealth under § 1983 is immaterial. Appellant chose the federal forum presumably with full knowledge that federal courts were never intended to be, and are not, courts of general jurisdiction; they are courts of limited jurisdiction only. They must "scrupulously confine their own jurisdiction to the precise limits which a [federal] statute has defined." Healy v. Ratta, 292 U.S. at 270, 54 S.Ct. at 703. The inability to obtain federal relief under a federal statute enacted to enforce provisions of the Fourteenth Amendment cannot, in and of itself, compel the inference that somehow a nonstatutory federal remedy exists to achieve that same objective.
 
 
 43
 The conclusion Appellant seeks would require reading into the jurisprudence a major premise that simply does not exist: that federal courts are tribunals of general jurisdiction. The proper major premise is the exact opposite: federal lower courts are courts of very limited jurisdiction; they can accord only those remedies particularly authorized by statute. The corresponding minor premise is that Congress and the Supreme Court have held that § 1983 is the statutory remedy for money damages for Fourteenth Amendment violations. Because both Congress and the Court have spoken decisively on this issue, we are required to draw conclusions contrary to that sought by the Appellant.
 
 
 44
 Similarly, that the CNMI may not assert the affirmative defense of Eleventh Amendment immunity is irrelevant. This argument makes an assumption that has not been proved; it begs the question whether Appellant is entitled bring the complaint against the Defendant. The threshold issue is not what defense is available to a defendant, but what authority permits plaintiff to file the complaint against the defendant. We cannot put the defense cart before the complaint horse. Appellant's first hurdle is to demonstrate what authority permits her to bring this Fourteenth Amendment claim against the CNMI. She has not overcome this hurdle.
 
 
 45
 Because we conclude that Appellant may not bring a claim for money damages against the CNMI given that Congress has not granted the federal courts power to recognize such a claim, the presence or absence of an affirmative defense is extraneous. If anything, Appellant's Eleventh Amendment argument cuts against her. We were advised at oral argument that there was no legal impediment for asserting a claim for employment discrimination directly against the CNMI in the Commonwealth court system under Commonwealth law. Therefore, appellant arguably had a remedy in the Commonwealth court system that is not available in the federal forum in which she chose to prosecute her claims. We need not address whether such a remedy in fact exists; and regardless of whether it does, we are confident that our holding today provides Magana with no less-and no more-than the Fourteenth Amendment protections afforded citizens of the United States. Absent congressional authorization, we are confined to such a conclusion.
 
 
 46
 For the foregoing reasons we affirm the district court's rejection of Appellant's attempt to assert a claim for money damages against the CNMI based solely on the Fourteenth Amendment. We now proceed to summarize the material facts that form the basis of her remaining contentions.
 
 II.
 
 47
 Teofanie M. Magana is a Filipino citizen residing in the Commonwealth. She was employed from May 26, 1992, until November 25, 1994, by the Commonwealth Health Center, a hospital operated by the CNMI government. Appellee Chong was Director of the department overseeing the Health Center until December 1993, and Appellee Abraham became Secretary of the Department on about January, 1994. The Health Center recruits nurses from the Commonwealth, mainland United States, Australia, Fiji, the Philippines and other areas not relevant here. Under CNMI law, the Health Center must give Commonwealth residents preference in employment positions before resorting to non-resident labor markets. Nurses employed by the Health Center are certified at varying levels, including the Professional Nurse II (PN II) and Professional Nurse III (PN III) positions at issue here.
 
 
 48
 According to a December 20, 1994 memorandum to the Secretary of Health from the Acting Chief of the Classification & Compensation Division of the CNMI Office of Personnel Management:
 
 
 49
 For placement in the [PN III] level, an employee must have a B.S. Degree in Nursing (BSN) plus three (3) years of nursing experience, and must also be a Registered Nurse (RN) by CNMI or U.S. State Board Examination. This is the minimum qualification requirement.
 
 
 50
 E.R. 135, 139. To be a PN II, applicants must have graduated from high school and possess an Associate Degree or diploma from an approved nursing program, have current Registered Nurse Licensure in the Commonwealth or passed the U.S. Board Examination and, depending on the position, have two or three years of clinical experience.
 
 
 51
 Appellee Abraham's affidavit stated that other factors are also considered in the classification of nurses, including familiarity with modern U.S.-based medical facilities, expertise with modern treatments, relevant market forces and the resources and needs of the Health Center. In their brief, Appellees state that "[t]he primary factor [determining a nurse's classification] is the need of the hospital.... The second factor is the applicant's qualifications." Br. of Appellees at 2. However, "[a]bsent extenuating circumstances, a nurse is generally not initially classified as a [PN III] if they only have qualifications for [PN II]." Once hired, nurses may be recertified from PN II to PN III.
 
 
 52
 Magana was hired by the Health Center for a PN II position beginning May 26, 1992. She was paid an annual salary and the terms of her contract included housing compensation. Her contract was renewed for the PN II position on or about May 26, 1994, at which time her annual salary was increased and she remained entitled to free housing. Magana's contract provided:
 
 
 53
 The Employer's work day and work week may vary from time to time according [sic] the needs of the Government. Every effort will be made to maintain a reasonable five (5) day, forty (40) hour work week. Pursuant to Public Law 1-20, § 5(b) any excepted service employee is considered executive, administrative or professional personnel. Therefore, an excepted service employee does not qualify for overtime or standby rates of pay.
 
 
 54
 C.R. Vol. II, Part 3(B) of Excepted Serv. Employment Contract. Throughout her employment, the Health Center paid Magana one and one-half times her salary for hours worked in excess of a 40-hour work week. Appellees claim the overtime payments were work incentives. The value of Magana's housing compensation was not included in the calculation of the payments made.
 
 
 55
 During the years Magana was employed with the Health Center, the number of PN III and PN II positions increased. In the relevant time period, all PN II positions were occupied by Filipinos and five Filipinos occupied PN III positions. Magana contends she was qualified for a PN III position when she was initially hired and that the Health Center hired and recommended certification of several Caucasian persons as PN IIIs who did not meet the specified minimum qualifications for that position. E.R. 93, 102, 130-133, 220. Magana contends further that none of the Filipino PN IIs were reclassified to PN III during the relevant period and that she was never informed of PN III vacancies. She claims notices concerning vacancies were never advertised or posted on Health Center premises, and that she would have sought PN III classification had she been informed of the vacancies. E.R. 90.
 
 
 56
 Appellees respond that Magana was not qualified for the PN III position when she was hired. They argue that she lacked experience and a Bachelor of Science degree. E.R. 44. Through a Declaration of Rosa M. Tudela, Manager of Nursing Services, Appellees explain that the eight Australian nurses to whom Magana referred as examples of Caucasians hired as PN IIIs, while lacking the requisite qualifications, were hired according to a special policy for Australian nurses.
 
 
 57
 Regarding six U.S. mainland nurses identified by Magana as additional examples of Caucasians hired as PN IIIs without the requisite BSN, Tudela stated that "other considerations warranted classifications and salaries higher than those that would otherwise be appropriate based only on a consideration of the individuals's education and training." Such considerations included length of post-degree experience, projected duties and responsibilities and the Health Center's needs at the time of employment. E.R. 94. Magana identified eight persons from the Pacific Islands as examples of non-Filipinos hired without the requisite credentials and Tudela explained that one of these individuals qualified under the Australian system, while six others had worked at the Health Center longer than Magana.
 
 
 58
 In September, 1994, Magana complained to Abraham about what she claimed to be disparate pay for Caucasian nurses with less education and experience than her. Shortly thereafter, a staff evaluation of Magana recommended that her contract not be renewed because she did not take criticism well and exhibited a poor attitude with patients. Magana filed suit on October 5, 1995, and by letter dated the same day was advised that her contract with the Health Center would not be renewed. The district court denied relief and she has appealed.
 
 III.
 
 59
 We now address Magana's contention that the district court erred in ruling she was not entitled to overtime payments under § 213 of Fair Labor Standards Act. Appellees successfully asserted in the district court that Magana is exempt from entitlement to overtime payments under § 213 of the FLSA because she is employed in a professional capacity. They raised this issue for the first time in their motion for summary judgment filed on March 3, 1996, more than three months after filing their answer.
 
 
 60
 Magana does not dispute the finding that nurses are "professionals" within the meaning of the FLSA. E.R. 167. She argues first that Defendants' exemption argument is an affirmative defense that was not raised in their initial responsive pleading and was, therefore, waived. Magana further contends that, even if Defendants did not waive the exemption defense, she remains covered by the FLSA overtime provisions because the CNMI failed to establish that her PN II position meets the salary test used by courts to determine whether employees are exempt under § 213(a). We do not meet the merits of this contention because we agree that the Appellees initially waived their "professional capacity" FLSA defense by failing to plead it in a timely fashion, and because we conclude the district court erred by allowing the Defendants to raise the defense in a motion for summary judgment without first determining whether the delay caused prejudice to Magana.
 
 
 61
 The FLSA requires covered employers to provide overtime compensation equal to one and one-half times the regular rate at which an employee is employed for hours worked in excess of a 40-hour work week. 29 U.S.C. § 207(a)(1). The Act exempts from the overtime provision "any employee employed in a bona fide executive, administrative, or professional capacity...." 29 U.S.C. § 213(a)(1). Exemptions to the FLSA are narrowly construed. Employers claiming an exemption have the burden of proving the allegedly exempt employees "fit plainly and unmistakably within [the exemption's] terms." Abshire v. County of Kern, 908 F.2d 483, 485-486 (9th Cir.1990) (alteration in original); Service Employees Int'l Union, Local 102 v. County of San Diego, 60 F.3d 1346, 1350 (9th Cir.1994).
 
 
 62
 This court has held that the § 213(b) FLSA exemption claimed here is an affirmative defense that must be pleaded and proved by the defendant. Jones v. Giles, 741 F.2d 245, 248-249 (9th Cir.1984) (citing Donovan v. Nekton, Inc., 703 F.2d 1148, 1151 (9th Cir.1983)). See also Fed. Rules Civ. Proc. (8)(c) and 12(b), (g).[5] We have liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings. However, defendants may raise an affirmative defense for the first time in a motion for summary judgment only if the delay does not prejudice the plaintiff. Rivera v. Anaya, 726 F.2d 564, 566 (9th Cir.1984). Here, the Defendants raised their FLSA affirmative defense three months after filing their answer. The district court erred in granting summary judgment for Defendants without determining whether their delay in raising the affirmative defense prejudiced Magana. The district court should make this determination on remand.
 
 IV.
 
 63
 We now turn to Appellant's claim asserted under 42 U.S.C. § 1981. Section 1981 has its roots in § 1 of the Civil Rights Act of 1866, 14 Stat. 27, and prohibits racial discrimination in the making and enforcement of contracts. It provides a federal remedy against race-based employment discrimination in the private and public sectors. 42 U.S.C. § 1981(a),(c); Runyon v. McCrary, 427 U.S. 160, 168-172, 96 S.Ct. 2586, 2593-95, 49 L.Ed.2d 415 (1976); Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 459, 95 S.Ct. 1716, 1719-20, 44 L.Ed.2d 295 (1975). In relevant part the statute provides:
 
 
 64
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, ... as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 65
 42 U.S.C. § 1981(a).
 
 
 66
 Although the term "race" does not appear in the statute, the Court has held that § 1981 provides a federal remedy against racial discrimination. Runyon, 427 U.S. at 168, 96 S.Ct. at 2593. In defining "racial" discrimination, the Court stated: "Section 1981, 'at a minimum,' reaches 'discrimination directed against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homo sapiens.' " Saint Francis College v. Al-Khazraji, 481 U.S. 604, 607-613, 107 S.Ct. 2022, 2025, 95 L.Ed.2d 582 (1987).
 
 
 67
 In addressing Magana's § 1981 claim, the district court cited portions of Magana's deposition. The court noted that when Magana was asked why she thought she was being discriminated against, she answered: "because she was from the Philippines." E.R. 176. From this, the court concluded that Magana alleged possible "nation of origin" discrimination, rather than racial, ancestral or ethnic discrimination. Clearly, "the line between discrimination based on 'ancestry or ethnic characteristics,' and discrimination based on 'place or nation of ... origin,' is not a bright one.... Often, ... the two are identical as a factual matter." Saint Francis, 481 U.S. at 614, 107 S.Ct. at 2028 (Brennan, J., concurring).
 
 
 68
 The deposition transcript and Magana's complaint demonstrate that Magana alleged discrimination based not solely on being from the Philippines, but also on being Filipino. E.R. 211-12. She did not limit her discrimination allegations to national origin. She also alleged racial, ancestral or ethnic discrimination and consistently alleged that she was discriminated against "because of her race." E.R. 9, 10, 11, 13, 181, 184, 186, 188. Moreover, Magana's complaint, amended complaint and declaration clearly allege disparate salaries and certification procedures were used for the "Caucasian" nurses hired from other nations compared to those applied to Filipinos. E.R. 4, 6, 12, 13, 60, 181, 182, 185, 186, 211-212.
 
 
 69
 We are satisfied that her pleadings met the requirements for a claim of discrimination under § 1981. Accordingly, we reverse the summary judgment and remand for consideration of whether Magana has set forth sufficient evidence, direct or circumstantial, establishing a prima facie case. The court must determine whether Magana has established the Commonwealth's intent to discriminate. See, e.g., Domingo v. New England Fish Co., 727 F.2d 1429, 1438 (9th Cir.1984). Further, the court must determine whether Magana meets the elements articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).
 
 V.
 
 70
 We turn now to Magana's claim under 42 U.S.C. § 1983. We have made clear that although "[n]either the CNMI nor its officers acting in their official capacity can be sued under § 1983," officers may be sued under that statute in their individual capacities. DeNieva, 966 F.2d at 483. Thus, Magana may proceed under § 1983 against Abraham and Chong only in their individual capacities. On this claim, the district court granted Appellees' motion for summary judgment on the ground that the claim was based only on conclusory statements. The court used the heightened pleading standard approved by us for claims in which subjective intent is an element of an alleged constitutional tort. Branch v. Tunnell, 937 F.2d 1382, 1385 (9th Cir.1991); Lindsey v. Shalmy, 29 F.3d 1382, 1385 (9th Cir.1994). Under this doctrine plaintiffs must present "nonconclusory allegations of subjective motivation, supported either by direct or circumstantial evidence, before discovery may be had." Branch, 937 F.2d at 1387; Lindsey, 29 F.3d at 1385.
 
 
 71
 Magana relies on Lindsey and argues the heightened pleading standard is inapplicable to this case because the posture is summary judgment and not a motion to dismiss. In Lindsey we stated:
 
 
 72
 Here we are dealing with a motion for summary judgment rather than a motion to dismiss, so application of a heightened pleading standard is inappropriate. Nevertheless, Branch is instructive. Mere conclusory assertions of discriminatory intent, embodied in affidavits or deposition testimony, cannot be sufficient to avert summary judgment. The court must satisfy itself that there is sufficient "direct or circumstantial evidence" of intent, id., to create a genuine issue of fact for the jury, before it can deny summary judgment on the ground of immunity.
 
 
 73
 29 F.3d at 1384-85 (citation omitted). At a minimum, the heightened pleading standard means that conclusory statements in pleadings are insufficient to survive a motion to dismiss a complaint when plaintiffs allege constitutional violations that embody an element of subjective intent or motive. It follows that when courts apply the heightened pleading standard upon a motion to dismiss, they will consider only the pleadings.
 
 
 74
 In contrast to a motion to dismiss, courts deciding motions for summary judgment must consider more than the pleadings. Depositions, answers to interrogatories, admissions on file and affidavits must also be evaluated. Because courts look beyond the pleadings in deciding a summary judgment motion, we do not apply the "heightened pleading standard" in ipsissimis verbis. As Lindsey teaches, we apply a kindred rule in summary judgment proceedings when defendants raise a qualified-immunity defense to alleged constitutional violations and we thereby require an increased evidentiary standard. In the summary judgment posture, the court must consider all the evidence in the record-not merely the pleadings. As with the heightened "pleading" standard, mere conclusory statements of discriminatory intent will be equally insufficient to avert summary judgment.
 
 
 75
 In the case at bar, the district court applied the proper heightened evidentiary standard upon summary judgment, but erred by considering only the pleadings. The court concluded that Magana failed in her amended complaint to satisfy the heightened pleading standard because she did not put Defendants "on notice, with particularity, of the constitutional violations they supposedly inflicted on [her]." E.R. 202. The court held that Magana's allegations that Defendants knew of, approved, ratified, or acquiesced in a policy, practice, or custom of discrimination against Filipinos, constituted "only conclusions" and omitted "facts which would support or lead to those conclusions." Id.
 
 
 76
 The district court failed to consider any evidence presented in the form of answers to interrogatories, supplemental declarations, a deposition and other materials then before the court. These supporting documents presented sufficient circumstantial evidence of discriminatory intent to withstand a motion for summary judgment.
 
 
 77
 The court had before it evidence that 100 percent of the PN IIs employed by Defendants between 1992 and 1994 were Filipino, E.R. 43, and evidence that Magana was being paid less than Caucasian PN IIIs who did not meet the stated minimum qualifications for that position. E.R. 92-111. Magana alleged and Defendants did not refute circumstantial evidence that they did not announce or post notices of vacant PN III positions to PN IIs, all of whom were Filipino. She also raised material questions of fact by identifying particular individuals, all of whom were Caucasian, who were hired without the requisite qualifications for a PN III. Magana raised material questions concerning whether any of the PN IIIs hired by Appellees during the relevant time were Filipino or whether all new PN IIIs were Caucasian. Id.; E.R. 213; E.R. 113. The court had before it evidence that a Bachelor of Science Degree in Nursing and three years of nursing experience are the minimum requirements for a PN III position, E.R. 135, 139, and evidence that such standards were arguably arbitrarily applied along racial lines in hiring and recertification decisions. E.R. 92-95. Moreover, the amended complaint itself sets forth facts from which a trier of fact could infer discriminatory intent. E.R. 180-183.
 
 
 78
 The evidence presented is highly circumstantial and the allegations have yet to be measured against conflicting evidence and inferences to be drawn therefrom. At this stage of the proceedings, however, the circumstantial evidence of intent presented by Appellant is sufficient to create a genuine issue of material fact and to defeat a summary judgment motion. See, e.g., Lindsey v. Shalmy, 29 F.3d at 1385. Therefore, we must reverse the grant of summary judgment on the § 1983 claims.
 
 
 79
 In light of our disposition, we decline jurisdiction over the appeal of the court's denial of summary judgment on claims brought under supplemental jurisdiction.
 
 
 80
 * * * * * *
 
 
 81
 REVERSE the entry of judgment for Appellees on Magana's FLSA and other wage claims and on her claims brought under 42 U.S.C. §§ 1981 and 1983. AFFIRM summary judgment for the Commonwealth on Magana's Fourteenth Amendment claim.
 
 
 
 *
 Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 That portion of Fleming holding that a claim under 42 U.S.C. § 1983 could be lodged against the Commonwealth "is no longer good law ..." in light of Will v. Michigan Dep't of State Police, 491 U.S. 58, 68-70, 109 S.Ct. 2304, 2310-12, 105 L.Ed.2d 45 (1989), and Ngiraingas v. Sanchez, 495 U.S. 182, 192, 110 S.Ct. 1737, 1743, 109 L.Ed.2d 163 (1990). DeNieva v. Reyes, 966 F.2d 480, 483 (9th Cir.1992)
 
 
 [2]
 The Act of April 20, 1871, provided in relevant part:
 That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication"; and the other remedial laws of the United States which are in their nature applicable in such cases.
 
 
 [3]
 42 U.S.C. § 1983 (§ 1979) in its current form provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia. (R.S. § 1979; Pub.L. 96-170, § 1, Dec. 29, 1979, 93 Stat. 1284.)
 
 
 [4]
 Congressional discussion of a bill to limit diversity jurisdiction in 1888 is illustrative of Congress' intentions during this era. House debate centered on the views articulated by Representative Rogers:
 He [another Congressman] seems to have a doubt as to whether or not Congress has power to withdraw this jurisdiction now vested by law in the Federal courts. The mistake, I take it, into which he has fallen occurs from the fact that he assumes the circuit courts and the district courts of the United States acquire their jurisdiction directly from the Constitution, and may exercise it without legislation by Congress. That is an error. The judicial power is limited by the Constitution; its confines are fixed by the Constitution; but the jurisdiction conferred upon the courts other than the Supreme Court originates with Congress.
 
 
 [19]
 Cong. Rec. 8309 (1888). Members eventually adopted this understanding of federal court jurisdiction-an understanding previously articulated by the Court in Sheldon v. Sill, 49 U.S (8 How.) 441, 449, 12 L.Ed. 1147 (1850) ("The political truth is, that the disposal of the judicial power (except in a few specified instances) belongs to Congress: and Congress is not bound to enlarge the jurisdiction of the Federal courts to every subject, in every form which the Constitution might warrant.") (citing Turner v. Bank of North America, 4 U.S. (4 Dall.) 8, 1 L.Ed. 718 (1799)), and in Cary v. Curtis, 44 U.S. (3 How.) 236, 11 L.Ed. 576 (1845) ("[T]he judicial power of the United States, although it has its origin in the Constitution, is ... dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of Congress....")
 
 
 [5]
 Rule 8(c), Federal Rules of Civil Procedure ("Affirmative Defenses"), states in relevant part:
 In pleading to a preceding pleading, a party shall set forth affirmatively ... [certain specified defenses] ... and any other matter constituting an avoidance or affirmative defense.
 Rule 12(b), Federal Rules of Civil Procedure, allows responding parties to assert a motion to dismiss for failure to state a claim upon which relief can be granted in their first responsive pleading-exactly what Defendants in this case did in their Answer. However, Rule 12(g) states in relevant part:
 If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted....