**MENDOCINO ENVIRONMENTAL CENTER; Betty Ball; Gary Ball, Plaintiffs,**

**Darryl Cherney; Darlene Comingore, executor of the estate of Judi Bari, Plaintiffs–Appellees–Cross–Appellants,**

v.

**MENDOCINO COUNTY, Mendocino County Sheriff; Tim Shea; Burl Murray, County of Mendocino Deputy Sheriff; Deputy Satterwhite; Humboldt County; Humboldt County Sheriff's Dept; Frank Vulich; Ciarabellini; David R. Williams; John Rikes; City of Oakland; Oakland Police Dept.; James Hahn; Ramon Paniagua; City of Ukiah; Ukiah Police Department; Fred Keplinger; Frank Doyle; Richard Wallace Held; Phil Sena; Stockton Buck; Patrick J. Webb; Horace Mewborn; Walt Hemje;**

**John Conway; Timoghty McKinley; Edward D. Appel, Defendants,**

C. Michael Sims; Robert Chenault; Michael Sitterud, Defendants–Appellants–Cross–Appellees.

No. 97–17375.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 1999.

Filed Sept. 24, 1999.

Karen A. Rodrigue, Office of the City Attorney, Oakland, California, for the defendants-appellants.

Dennis Cunningham, San Francisco, California, for the plaintiffs-appellees.

Before: SCHROEDER, REINHARDT, and SILVERMAN, Circuit Judges.

Opinion by Judge REINHARDT; Concurrence by Judge SCHROEDER.

REINHARDT, Circuit Judge:

Shortly before noon on May 24, 1990, a bomb went off underneath Judi Bari's car seat as she drove through Oakland, California. The explosion severely injured Bari, a prominent leader of the environmental organization Earth First!, shattering her pelvis and causing other serious internal injuries that left her in constant pain for the rest of her life. The explosion also caused lacerations and other injuries to Darryl Cherney, another Earth First! activist and a passenger in Bari's car. Within twenty-four hours of the explosion, Oakland police officers placed Bari and Cherney under arrest. Along with the FBI agents assigned to the investigation, the Oakland police concluded that the two injured individuals had been transporting the bomb and that an explosion had accidently been triggered.

Shortly after Bari's arrest and immediately prior to Cherney's, the police obtained a warrant and searched Bari's residence; they later secured a second warrant for the same purpose. Law enforcement officials announced to the press their conclusion that Bari and Cherney were responsible for the explosion and released incriminating information about the two activists, much of which later turned out to be false. Less than two months after the explosion, the Alameda County District Attorney's Of-

fice, having failed to find evidence of Bari and Cherney's culpability, announced that it declined to file charges against either of them.

In 1991, Bari and Cherney filed an action in federal court. The amended complaint included among the defendants several members of the Oakland police department and a number of FBI agents; it alleged that the arrests and the two searches violated Bari and Cherney's Fourth Amendment rights, and that federal and local law enforcement officers had entered into a conspiracy to accuse them falsely of responsibility for the explosion and thereby inhibit their political activities, all in violation of the First Amendment. The appellants on this interlocutory appeal are three Oakland police officer defendants. They assert that the district court erred in denying them summary judgment on their qualified immunity defense to the Fourth Amendment claims; at the same time, Bari and Cherney seek to cross-appeal and ask us to vacate the district court's grant of summary judgment in favor of appellants on the First Amendment and conspiracy counts.

This case is now before this court on interlocutory appeal for the second time.[1] Although the action was filed over eight years ago, it has not yet reached trial. In the interim Bari has died from cancer.[2] In January 1997, when she was informed by her doctor that she did not have long to live, Bari gave a deposition in this case and then died a little over a month later.

We affirm the district court's denial of appellant's motion for summary judgment on qualified immunity. We also exercise our discretion to decide the cross-appeal and hold that the plaintiffs have raised genuine issues of material fact as to whether the appellants participated in an illegal conspiracy and violated the plaintiffs' First Amendment rights. Accordingly, we vacate the part of the summary judgment order that granted judgment to appellants on those claims.[3]

## I.

## FACTUAL BACKGROUND

At the time the bomb exploded in her car, Bari, along with Cherney, was in Oakland, California, taking part in a speaking and concert tour to promote the upcoming Redwood Summer and to attract young people from all over the country to Northern California to protest logging practices. This organizing campaign had "generated considerable opposition and animus among individuals in the logging and timber industry," animus that the plaintiffs contend was shared by local and federal law enforcement officials. *Mendocino Env'l Ctr.*, 14 F.3d at 459. As a prominent leader of Earth First!, Bari had led aggressive demonstrations and organizing campaigns against clearcutting practices, particularly those targeting old growth redwoods. In response to this very public and controversial environmental activism, she had received a number of death threats, which she had reported to the police in the county in which she resided.

The criminal investigation began at the scene of the explosion, where FBI agents were joined by local law enforcement officials, including the three appellants, Lieutenant C. Michael Sims, Sergeant Robert

---

1. In 1994, we rejected an interlocutory appeal filed by the defendant FBI agents, who challenged the district court's denial of their motion to dismiss on the ground of qualified immunity. *Mendocino Env'l Ctr. v. Mendocino County*, 14 F.3d 457, 459–60 (9th Cir. 1994).

2. Bari's executor has been substituted as a party. We use the term "Bari" throughout to

refer to Judy Bari, the executor of her estate, or both as may be appropriate.

3. The district court also granted judgment in favor of a number of other defendants on the ground that there was no showing that they had participated in the investigation of the explosion or had any animus against appellees. That part of the order is not before us on this appeal.

Chenault and Sergeant Michael Sitterud, of the Oakland Police Department. Although the FBI apparently took the lead in investigating the physical evidence, the appellants were present at the crime scene and examined that evidence, in particular Bari's car and the effect the explosion had on it. They directly observed the most obvious damage: a large hole below the place where the driver's seat was located— a hole that extended backward into the area between the front and back seats and forward almost to the gas and brake pedals.

*The Arrests of Bari and Cherney and the First Search Warrant*

Most of the events out of which this lawsuit arises occurred during the twenty-four hour period immediately following the explosion. At 3:00 p.m., just a few hours after the bomb went off, Bari was arrested in her hospital bed.[4] Later that evening, FBI Special Agents (SAs) Reikes and Doyle briefed a group of Oakland police officers, including Lieutenant Sims, Sergeant Chenault and Sergeant Sitterud, about the progress of their investigation, reporting the preliminary conclusions that they had drawn from the physical evidence and recounting their suspicions that in the past Earth First! had been involved in incidents of environmental sabotage. The district court identified a number of factual disputes regarding the content of this briefing, disputes that are relevant because of the appellants' contention that the first search warrant affidavit (and, indeed, the second) was based largely on the information provided at that time.[5] Lieutenant Sims also purports to have relied on the same general information, allegedly provided by the FBI both at the briefing and in less formal conversations, as the basis for his decisions to arrest both individuals.[6]

The search warrant affidavit, prepared and signed by Sergeant Chenault, identified the following as factors supporting probable cause to search Bari's residence: the FBI agents' conclusion that the bomb had been located on the floor behind the driver's seat, making it visible to the car's occupants—a conclusion based principally on SA Doyle's observation that the hole caused by the bomb was "immediately behind the driver's seat;" SA Doyle's report that the nails used in the bomb were "identical" to nails found in a bag in Bari's car; the affiant's belief (which he subsequently testified was based on statements by FBI agents) that Earth First! was a "violent terrorist group;" interviews that Sergeants Chenault and Sims had conducted with two Seeds of Peace activists who had told them that Earth First! had a violent reputation; and statements made by Bari and Cherney shortly after the explosion demonstrating that they knew that a bomb had exploded.

On the basis of the Chenault affidavit, at 2:21 a.m. on May 25, the Oakland municipal court issued a warrant to search Bari's residence. At 3:00 a.m., Sergeant Sitterud formally arrested Cherney. Before his arrest, Cherney had consented to an FBI search of his van, which led to the discovery of what Sergeant Sitterud characterized as "a road spiking kit."[7] That was

---

4. Bari was informed of her arrest by two uniformed Oakland police officers when she awoke after having been sedated for emergency medical procedures.

5. In fact, Sergeant Chenault claims that SA Frank Doyle "almost dictated" much of the affidavit as Chenault typed it into the computer immediately following the FBI briefing. SA Doyle reports a significantly different version of events, contending that he merely made a few corrections after reviewing an affidavit that had already been prepared by the Oakland police.

6. As noted above, Bari's arrest occurred in the afternoon of May 24, well before the briefing. This renders puzzling, to say the least, Sims' testimony that he did not decide to make the arrest "until after consulting with FBI agents and Alameda County Deputy District Attorneys at Oakland Police Headquarters in the late evening of May 24 and early morning of May 25, 1990."

7. A "road spiking kit" is used by some environmental activists to blow out the tires of passing lumber trucks. The plaintiffs deny that the materials found in Cherney's van constituted the elements of such a kit.

the only information that supported Cherney's arrest other than that contained in the affidavit.

### The Anonymous Letter and the Second Search Warrant

On May 29, an anonymous letter was sent to a local reporter by someone calling himself "the Lord's Avenger." This letter claimed responsibility for, and included detailed accurate information about, both the bomb that exploded in Bari's car and a pipe bomb explosion near a lumber company office building that had taken place two weeks earlier.

In part on the basis of an alleged need to look for evidence that Bari was the author of the "Lord's Avenger" letter, the police sought and obtained a second warrant to search her home. Sergeant Sitterud prepared the affidavit in support of this warrant, which attached the affidavit used to obtain the first search warrant and added a new piece of information: The new affidavit said that SA David Williams, a member of the FBI's Explosives Unit, had found that the tool marks on nails discovered at Bari's house during the first search were "identical" to those on nails used in the bomb, and had stated that both sets of nails were part of a batch of 200 to 1000 nails that was fabricated on the same machine.

On July 6, 1990, the second search warrant was issued. The same day, the Oakland police held a press conference publicizing their claim that they had evidence that the bomb belonged to the plaintiffs and emphasizing the common source of the nails.

### Dismissal of Charges and the Filing of the Lawsuit

Because the investigation ultimately failed to turn up sufficient evidence to support any charge against Bari or Cherney, on July 17 the Alameda County District Attorney's office announced that it would not pursue its allegations against either individual.

On April 8, 1991, Bari and Cherney filed an action in federal court. The complaint alleged that local and federal law enforcement officials had arrested them without probable cause and had knowingly or recklessly included false information in the search warrant affidavits, all in violation of the Fourth Amendment, and that the officers had entered into a conspiracy to violate the plaintiffs' constitutional rights and had intentionally hindered plaintiffs' First Amendment activities.

Discovery proceeded slowly; the parties engaged in extensive pretrial litigation, and, as described earlier, an interlocutory appeal was taken to this court by some of the FBI defendants following the district court's denial of their motion to *dismiss* the complaint on the ground of qualified immunity. In March 1997, having succeeded in defeating that appeal but apparently concerned that the defendants planned to delay moving for *summary judgment* on the basis of qualified immunity as long as possible (and thus to delay as well the almost inevitable second interlocutory appeal),[8] the plaintiffs filed a "Motion for Certification that No Qualified Immunity Exists for Any Defendant."[9] Defendants then made cross-motions for summary judgment on qualified immunity and on other grounds, and, on October 15, 1997, the district court issued its decision. The court denied the motions of appellants

---

8. The motion to dismiss on qualified immunity grounds was filed by all of the defendants. Nevertheless, under *Behrens v. Pelletier*, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), all defendants, those who unsuccessfully appealed and those who did not, were free to file a second interlocutory appeal on qualified immunity grounds, if and when a summary judgment motion was denied.

9. The district court found that the plaintiffs had the right to file their "motion for certification" under FRCP 56(a), despite the defendants' argument that the plaintiffs could not force them to assert qualified immunity at that time. The appellants do not appeal that part of the district court's decision.

Sims, Chenault and Sitterud for qualified immunity on the Fourth Amendment claims,[10] as well as their other motions with respect to those claims. In each instance the district court concluded that disputed issues of material facts precluded summary judgment. However, it granted summary judgment to some of the FBI agents on the Fourth Amendment claims,[11] concluding that their minimal involvement in the arrests and searches did not provide a basis for liability. It then found sufficient evidence of the existence of a conspiracy and of a First Amendment violation on the part of six of the FBI agents,[12] and denied their motions for qualified immunity on those claims, but it granted summary judgment to the appellants (Sims, Chenault and Sitterud) with respect to that aspect of the complaint. The district court held that there was insufficient evidence that the Oakland officers were part of the conspiracy or that the local police officials harbored any politically motivated animus toward the plaintiffs.[13]

Sims, Chenault, and Sitterud filed this interlocutory appeal of the district court's denial of their motions for qualified immunity on the Fourth Amendment violations. Bari and Cherney seek to cross-appeal the district court's grant of summary judgment on their First Amendment and conspiracy claims, although no notice of cross-appeal has been filed.

## II.

## THE APPEAL

### A.

### INTERLOCUTORY JURISDICTION

■ The district court held that disputes of material fact precluded summary

judgment to the Oakland police officers on their qualified immunity defense to the appellees' Fourth Amendment claims. A district court's determination that the evidence presented by the parties raises genuine factual disputes is not reviewable on interlocutory appeal. *See Johnson v. Jones*, 515 U.S. 304, 307, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). However, here, the appellants raise two legal issues: whether the district court's qualified immunity ruling is legally inconsistent with its dismissal of the appellees' conspiracy claim, and whether the district court misapplied the law governing police officers' reasonable reliance on information obtained from other law enforcement officials. This court has jurisdiction to resolve these legal questions on an interlocutory appeal from a denial of qualified immunity. *See Collins v. Jordan*, 110 F.3d 1363, 1370 (9th Cir.1997) (legal claims such as lack of materiality are reviewable on interlocutory appeal of denial of qualified immunity). Our review is thus limited to the question whether, if all conflicts in the evidence that the district court identified are resolved in the appellees' favor, the appellants would nevertheless be entitled to qualified immunity as a matter of law for one of the reasons they have advanced on this appeal. We answer that question in the negative.

### B.

### MERITS OF THE APPEAL

In appealing the district court's denial of their motions for summary judgment on their qualified immunity defense, the ap-

---

10. The district court also denied motions for qualified immunity by two FBI agents, SA Doyle and SA Reikes. The agents did not appeal the decision.

11. These FBI agents were SAs Held, Appel, Sena, Buck, and Webb.

12. These defendants were SAs Doyle, Reikes, Sena, Buck, Hemje and Conway.

13. In addition to the appellants, the court granted judgment as a matter of law on the conspiracy and First Amendment claims to SAs Webb, Held, Appel, and McKinley, and Oakland Police Captain Hahn. All of these defendants have now been dismissed from the case, and appellees do not challenge their dismissal on the appeal.

pellants raise only two issues. First, they argue that two of the important rulings the district court has thus far issued are legally inconsistent—specifically, they contend that the court's grant of summary judgment on the conspiracy and First Amendment claims demonstrates that the appellants neither intended nor agreed to inhibit the appellees' political expression by falsely accusing them of responsibility for the bombing, and thus renders the disputed facts that the court relied on in its determination not to grant them qualified immunity immaterial. Second, relying heavily on *Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), which holds that a police officer may reasonably rely on a representation by other officers as to the existence of probable cause, the appellants argue that they are entitled to qualified immunity because their actions were taken in reasonable reliance on information provided by FBI agents.

■ As to the first argument, because we have decided to reverse the district court's dismissal of the First Amendment and conspiracy claims, *see* Part III *infra,* there is no longer any conceivable inconsistency among the rulings. Moreover, even if we agreed with the district court that there was no evidence of conspiracy between the FBI agents and the Oakland police officers, such a conclusion would not in itself justify a grant of qualified immunity to the appellants. A finding that the three local police officers were not a part of the agreement to violate the appellees' First Amendment rights would be of assistance to their defense in general, but it would not require the conclusion that the officers could reasonably have believed that their actions in obtaining the search

warrants and deciding to arrest Bari and Cherney were lawful. We therefore reject the appellants' inconsistency argument on both these grounds.

■ The appellants' second argument, that their reasonable reliance on the information provided by the FBI agents entitles them to qualified immunity, ignores the fact that, *with respect to every statement upon which the appellants claim to have relied,* the district court found a factual dispute as to what the FBI agents actually said. First, the district court found that the assertion in the Chenault affidavit that SA Doyle told the appellants that the nails found in the *bag* in Bari's car were identical to those used in the bomb was directly disputed by SA Doyle's deposition testimony, in which he asserts that he does not even remember seeing a bag of nails at the scene but instead only recalls comparing the nails used in the bomb to loose nails found in the *road.*[14] Second, the court found that there was conflicting evidence in the record as to whether SA Doyle informed the appellants that his conclusion that the bomb was located on the floor of the back seat was tentative and subject to further evaluation. Moreover, the district court noted that while Chenault's affidavit asserted that Doyle's conclusion regarding the location of the explosive device was largely based upon his observation of "a large hole in the rear seat floorboard immediately behind the driver's seat," the appellants had been at the scene and had personally observed the location of the hole caused by the explosion. The court set forth observations by several other law enforcement officials that made it clear that the hole was principally located *underneath* the driver's seat.[15] Given that the physical facts observed by

14. Although the appellants do not defend the truthfulness of the allegation that the nails in Bari's bag were identical to those in the bomb, it is worth noting that the district court found that there was no real dispute that the statement was false; photographs reveal that it would be obvious to any objective observer that the nails were not even *similar* to one another (those in the bag had flat heads, and those in the bomb had rounded heads).

15. In fact, the subsequent tests led FBI agents to conclude that the bomb *was* hidden *under* the driver's seat, probably camouflaged by a towel, and was detonated by a motion-triggered device.

Chenault and others were inconsistent with the statement attributed to SA Doyle by Chenault in his affidavit—that the hole was *behind* the driver's seat—and that this statement was identified as the basis for SA Doyle's opinion regarding the bomb's location, there is a factual issue as to whether the appellants actually relied on SA Doyle's opinion regarding the location of the bomb, tentative or otherwise, and whether such reliance could in any event be reasonable.[16] The district court also found a factual dispute as to whether the Chenault affidavit misrepresented SA Doyle's qualifications, when it described him as an "expert concerning bombing matters" who had testified in numerous trials, although Doyle actually had no expertise or experience in this area. Third, the district court found a dispute as to whether statements by FBI agents formed the basis for Chenault's declaration that he believed that Bari and Cherney were "members of a violent terrorist group involved in the manufacture and placing of explosive devices." The court pointed to SA Reikes' sworn denial that the FBI ever said or implied that Earth First! was a terrorist organization. Fourth, the district court found that SA Williams' deposition testimony directly contradicts the claim in the Sitterud affidavit that Williams told the Oakland police that the nails used in the bomb and the nails found during the first search of Bari's house were part of a batch of 200 to 1000 nails that had been manufactured on the same machine. Williams expressly denies having ever said that it was possible to determine the number of nails in a batch, and asserts that a single batch can in fact include millions of nails. The Sitterud affidavit also represented SA Williams to be an expert in tool mark identification, but in his deposition Williams states that he had never before examined nails in order to draw conclusions about their manufacture nor had he ever had any formal training in this area. Finally, even though the appellants knew that much of the information included in the first search warrant affidavit was false by the time they applied for the second warrant,[17] they merely attached the first affidavit without pointing out or correcting any of the inaccuracies.

■ These factual disputes raise genuine issues of fact regarding the appellants' contention that they relied upon representations by FBI agents regarding the evidence against Bari and Cherney. We therefore reject the second of appellants'

16. Although a police officer is entitled to rely on information obtained from fellow law enforcement officers, *see United States v. Bernard*, 623 F.2d 551, 560–61 (9th Cir.1980), this in no way negates a police officer's duty to reasonably inquire or investigate these reported facts. We have denied qualified immunity to police officers who had indisputably relied on information obtained from other law enforcement officials, when we concluded that they violated their duty to conduct further investigation. *See Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir.1986) (federal agents' reliance on assurances by local police officers that appropriate warrants had been obtained, and resultant failure to inquire about the nature or scope of these warrants, was unreasonable); *United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir.1994) (inclusion in affidavit of account of arrest provided by another police officer and failure to conduct additional investigation may be reckless when account omitted material facts).

17. By the time the second warrant was obtained, SA Williams had conducted experiments on a model of Bari's car and concluded that the bomb had been hidden under the driver's seat rather than placed on the floor behind it, and that it had been further camouflaged by a towel placed over it. On June 14, Sergeant Sitterud had met with SAs Williams, Doyle and Hemje to examine the model of Bari's car with the explosive device placed under the seat; he was also briefed on the FBI agents' conclusions. Sergeant Sitterud's awareness of the inaccuracy of the information regarding the location of the bomb that was included in the first search warrant affidavit was further demonstrated by his statement at the July 6 press conference that the bomb was "farther under the seat than we originally thought." This admission was not included in the second search warrant affidavit.

**1294**

two arguments: namely, that the district court failed properly to apply *Whiteley* or to afford appellants the right to reasonably rely on statements by other law enforcement officials.[18]

Although the appellants do not adequately raise as an issue on appeal the contention that the genuine disputes of fact found by the district court are not material, and instead complain only generally and vaguely about a lack of materiality in the district court's findings, we will briefly consider whether, if we disregard all of the disputed statements attributed to the FBI, " 'a reasonable officer could have believed [the arrests] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.' " *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In short, we will examine whether the genuine issues of fact found by the district court are material.

▆▆▆▆ Aside from the information the appellants contend they received from the FBI, they rely on only three "facts" as support for probable cause to arrest Bari and Cherney and to search Bari's residence. Two of those "facts" are of little or no relevance, and there is a factual dispute as to whether the officers accurately reported the third. First, the search warrant affidavit relates statements made by Bari and Cherney shortly after the car exploded that they knew that the explosion was caused by a bomb. It is hardly surprising that a person who had received death threats and a fellow activist aware of those threats, both of whom were in a car that exploded violently,

causing them serious injuries, would express the opinion that they had been the victims of a car bombing. Certainly their expressing that opinion does not provide any support for an objective belief on the part of a reasonable law enforcement officer that there is probable cause to arrest them. Moreover, the record shows that the police had reason to know that Bari had received death threats: within a few hours of the explosion, both Bari and Cherney gave the police officers the names of individuals who had made those threats, and later that night Cherney told the officers that copies of some of the death threats were in the backpack that the officers had seized at the scene.[19] Officer Chenault's affidavit further notes that Cherney's statement to the paramedic that a bomb had been thrown at the car was "inconsistent with the physical evidence found at the scene." As the district court concluded, this statement would be of limited relevance because it "could just as easily be interpreted to show that Mr. Cherney was ignorant of the source of the explosion." The second "fact" is that by the time of Cherney's arrest, the police had discovered a suspected road spiking kit in his van. As the district court pointed out, however, even if the materials that the police discovered in Cherney's van did constitute a road spiking kit (which Cherney denies), this had little or no relevance or connection to the bombing. Third, the Chenault affidavit reported that in interviews with Chenault and Sitterud two environmental activists, members of Seeds of Peace, told the officers that Earth First! had a reputation for violence, property destruction and sabotage. However, the truthfulness and accuracy of the affidavit in this regard is disputed. The two

---

**18.** We also reject the appellants' argument that they reasonably relied on representations by district attorneys that the information reported in the affidavits supplied sufficient probable cause. The issue is not whether the contents of the affidavits, if true, were adequate to provide probable cause. Rather, here, the appellees' contention is that the appellants obtained the warrants by *misrepre-*

*senting* the facts in the affidavits. Under these circumstances, the opinion of the district attorneys is clearly of no relevance.

**19.** Moreover, two Seeds of Peace activists who were interviewed by Chenault and Sitterud both assert that they informed the officers of the death threats against Bari.

activists assert that Chenault's affidavit deliberately distorted their statements. As in the case of the FBI statements, there is a genuine dispute of fact with regard to what the officers were told. Here, the two activists contend in their depositions that they mentioned Earth First!'s reputation for violence to the two officers only in the context of informing them that they had determined that the reputation was unwarranted. The two activists deny having made a number of the statements attributed to them in the affidavit, describing many parts of it as "flat out lie[s]" and an "absolute distortion of what I said." Because the content of the statements is disputed, the statements cannot be relied upon in a motion for summary judgment; moreover, even if we were to assume that the characterization was accurate, information about a group's reputation is legally insufficient to support probable cause that a member of that group is involved in criminal activities. *See United States v. Brown,* 951 F.2d 999, 1003 (9th Cir.1991) (involvement in corrupt unit is not sufficient to establish probable cause); *United States v. Rubio,* 727 F.2d 786, 792–93 (9th Cir.1983) (without more, membership in Hell's Angels does not establish probable cause that defendant was involved in criminal activity).

Without suggesting in any way that the information that appellants contend they received from the FBI would be sufficient to support a claim of qualified immunity if the FBI actually conveyed that information to the appellants, we hold that in the absence of such information (which we may not consider because it is the subject of a genuine dispute of fact both as to its source and content) there would unquestionably be no basis for the claim.[20]

Our conclusion is applicable to all of appellees' Fourth Amendment claims, including the *Franks* claim.[21] We begin with the precept that a police officer who recklessly or knowingly includes false material information in, or omits material information from, a search warrant affidavit "cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost." *Branch v. Tunnell,* 937 F.2d 1382, 1387 (9th Cir.1991) (internal quotation marks and citation omitted). Thus, in order to survive a summary judgment motion in a section 1983 case involving a *Franks* claim, the plaintiffs need only "establish a substantial showing of a deliberate falsehood or reckless disregard and establish that, without the dishonestly included or omitted information ... the affidavit is insufficient to establish probable cause." *Hervey v. Estes,* 65 F.3d 784, 789 (9th Cir.1995). This is the same showing that is required to obtain a *Franks* evidentiary hearing in a criminal case. *See id.* at 789. In general, "the question of intent or recklessness is a factual determination for the trier of fact," and "[c]lear proof of deliberate or reckless omission is not required." *Liston v. County of Riverside,* 120 F.3d 965, 974 (9th Cir.1997) (internal quotation marks and citations omitted).

Accepting, for purposes of this analysis, the version of the disputed facts most favorable to appellees, they have shown the requisite intent and recklessness on the part of appellants with respect to misrepresentations in the two search

---

**20.** We note that even one of the FBI agents who is a defendant in this case has stated that the FBI was "concerned about the Oakland police's hasty arrest."

**21.** Under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a defendant in a criminal case may obtain an evidentiary hearing by making a substantial showing that a police officer, either knowingly or with reckless disregard for the truth, included a false statement in a search warrant affidavit, and that the allegedly false statement was necessary to the finding of probable cause. 438 U.S. at 155–56, 98 S.Ct. 2674. If these allegations are proven by a preponderance of the evidence at the evidentiary hearing, the defendant has established a Fourth Amendment violation and the evidence obtained through the warrant must be suppressed. *Id.* at 156, 98 S.Ct. 2674.

warrant affidavits of the information purportedly obtained from the FBI agents, including the false or reckless statements about the location of the bomb and the two separate false and reckless statements tying nails possessed by Bari to the bombs. Furthermore, the appellees have made a showing that the appellants knowingly or recklessly omitted mention of the death threats against Bari and knowingly or recklessly mischaracterized the content of the statements made by the two Seeds of Peace witnesses. Given the analysis of the factual and legal issues we have set forth earlier in this section, there can be no question that the district court was correct when it concluded that the appellees made a sufficient showing of a *Franks* violation to defeat appellants' motions for summary judgment on their qualified immunity defense.

## III.

## THE CROSS–APPEAL

## A.

## JURISDICTION

We must resolve two distinct jurisdictional questions before reaching the merits of the appellees' cross-appeal.[22]

### 1. Interlocutory Jurisdiction

■ In general, on interlocutory appeal, a review of the failure to grant qualified immunity is limited to that issue. *See Swint v. Chambers County Comm'n,* 514 U.S. 35, 50–51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). However, the Supreme Court has left open the question "whether or when it may be proper for a court of appeals, with jurisdiction over one ruling, to review, conjunctively, related rulings that are not themselves independently ap-

pealable" when those rulings are "inextricably intertwined with that court's decision to deny the individual defendants' qualified immunity motions, or ... review of the former decision [i]s necessary to ensure meaningful review of the latter." *Id.* at 50–51, 115 S.Ct. 1203. We have answered that question in the affirmative, and have exercised jurisdiction over related rulings in a case that involved difficult questions regarding allegedly unlawful searches and arrests, and is similar in many respects to the one before us. In *Marks v. Clarke,* 102 F.3d 1012 (9th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997), we assumed jurisdiction over separate rulings on liability on an interlocutory appeal from a ruling denying qualified immunity when the rulings all involved on the same reasoning and facts and the failure to decide the liability questions might have resulted in inconsistent decisions on related issues. *See id.* at 1018.

■ Here, the appellants rely on the district court's ruling on the conspiracy question and contend that it is dispositive of their interlocutory appeal. They argue that the district court's rulings on liability and qualified immunity are inconsistent, and that the earlier liability ruling—that the appellees failed to present evidence of a conspiracy—necessarily controls the resolution of the qualified immunity issue. The appellees, on the other hand, challenge the district court's ruling on the conspiracy issue, and assert that if we hold their challenge to be meritorious, our determination will be equally dispositive of the interlocutory appeal. In other words, both parties contend, for opposite reasons, that a ruling on the related liability issue would be determinative of all questions raised on the qualified immunity appeal. In one sense, the parties are wrong; we

---

**22.** For convenience, in our discussion of the cross-appeal we continue to refer to the defendants-appellants as appellants, as we did in Part II, even though in actuality they are for purposes of this Part of the opinion cross-appellees. Similarly, we continue to refer to

the plaintiffs-appellees as appellees, even though they are for purposes of this Part properly termed cross-appellants. Here, the virtues of simplicity outweigh those of accuracy.

can decide the qualified immunity appeal without reaching the conspiracy issue. In another sense, however, they are right—we could, unquestionably, decide the case on the basis of the conspiracy issue. Were we to accept the appellants' argument that as long as there was no conspiracy their reliance on the FBI agents was reasonable (and they would therefore be entitled to qualified immunity), we might be required to consider whether the district court's ruling that there was no evidence of a conspiracy was correct. The appellees' argument that the rulings are inextricably linked is, however, far stronger than that. Were we to determine that the appellees are correct in asserting that they have raised a question of fact about the existence of a conspiracy among the FBI agents and the Oakland police officers, then that determination certainly would control the resolution of the qualified immunity issue: for, given the appellants' heavy reliance on the statements made by the FBI agents, as long as the possibility of a conspiracy remains unresolved, the defense that the Oakland officers reasonably relied on information obtained from those agents would be unavailable on summary judgment and the appellants could not establish immunity from suit at this stage of the proceedings. Moreover, were we to resolve the qualified immunity issue on that basis—and it would be an appro-

priate way for us to resolve that question—we would be creating a direct conflict with the district court's liability ruling on the conspiracy claim.[23]

In deciding whether the rulings are inextricably linked, we conduct a preliminary review of the issues and consider the non-frivolous contentions of the parties, rather than first resolving the merits and then determining whether the rulings are inextricably linked.[24] We also consider the various bases on which the issues might be resolved, but, again, do not make that determination before deciding the jurisdictional question. In this case, given that both sides rely heavily on the resolution of the conspiracy issue as dispositive of the qualified immunity question, and given that our preliminary review suggests that the conspiracy ruling *could* well be determinative of this appeal, we hold that the questions are inextricably intertwined and we exercise jurisdiction over the conspiracy ruling.[25]

2. **Failure to file a notice of cross-appeal**

■ When an appeal of a judgment is filed, and an appellee then decides that it wants to bring a cross-appeal, Federal Rule of Appellate Procedure 4(a)(3) provides for the filing of a notice of cross-appeal within fourteen days. The appellants claim that the appellees' failure to file

23. The conspiracy issue appears to carry along with it the First Amendment issue, because the alleged conspiracy was essentially to suppress the First Amendment activities of the Earth Firsters. Moreover, the evidence that supports the conspiracy and the First Amendment claims is the same.

24. Thus, we would not at this stage of our inquiry resolve the question raised directly on this interlocutory appeal—i.e., does a genuine dispute of material fact exists with respect to whether the Oakland officers actually relied on bona-fide statements by FBI officers? We do so only after we have resolved the jurisdictional question. The same is true of the resolution of the inextricably linked question which is dispositive of the ruling challenged on the cross-appeal: whether the Oakland officers and the FBI conspired to falsely ac-

cuse appellees of violent actions. We arrive at that answer also only after the jurisdictional question is decided.

25. Our analysis is analogous to that followed by federal courts in resolving comparable jurisdictional issues such as standing, *see Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), and mootness, *see United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980), as well as other issues such as class action certification, *see Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and reviewability, *see, e.g., America West Airlines v. National Mediation Bd.*, 119 F.3d 772, 775 (9th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1301, 140 L.Ed.2d 467 (1998).

such a notice is a jurisdictional bar to our consideration of the cross-appeal. However, we have held that the requirement of a notice of cross-appeal is a rule of practice, which can be waived at the court's discretion, rather than a jurisdictional requirement:

> Although an initial notice of appeal is mandatory and jurisdictional, a protective or cross-appeal is only the "proper procedure," not a jurisdictional prerequisite once an initial appeal has been filed.... It has long been recognized that an appellate court has broad power to make such dispositions as justice requires.

**26.** While other decisions by this court have cited the appellee's failure to file a notice of cross-appeal as the ground for refusing to consider its arguments, these cases have not held that this rule is jurisdictional; they have merely stated the general rule that a party that does not file a cross-appeal is not entitled to challenge favorable rulings by the district court, and have usually not articulated any reason for failing to make an exception in the particular case. *See Gulliford v. Pierce County,* 136 F.3d 1345, 1351 (9th Cir.1998) (quoting *Spurlock* and noting that party gave no explanation for failure to file cross-appeal); *Spurlock v. FBI,* 69 F.3d 1010, 1018 (9th Cir.1995) ("An appellee who fails to file a cross-appeal cannot attack a judgment with a view towards enlarging his own rights."); *Dodd v. Hood River County,* 59 F.3d 852, 864 (9th Cir.1995) (refusing to consider issue not reached by district court because defendants, "having not filed a cross-appeal, may ... not obtain from us relief more extensive than it received from the district court"); *United States v. Poulsen,* 41 F.3d 1330, 1333 n. 1 (9th Cir.1994) ("Poulsen did not file a cross-appeal regarding the search and seizure of the items in his apartment. Thus, the constitutionality of that search and seizure is not before this court."); *Turpen v. City of Corvallis,* 26 F.3d 978, 980 (9th Cir.1994) ("Since Plaintiffs did not file a cross-appeal, we decline to address the question.").

**27.** *See Texport Oil Co. v. M/V Amolyntos,* 11 F.3d 361, 366 (2d Cir.1993); *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 33 (D.C.Cir. 1990); *LaFaut v. Smith,* 834 F.2d 389, 394 n. 9 (4th Cir.1987). The Eighth Circuit has also treated the cross-appeal rule as non-jurisdictional. *See Hysell v. Iowa Pub. Serv. Co.,* 559 F.2d 468, 476–77 (8th Cir.1977). However, it

*Bryant v. Technical Research Co.,* 654 F.2d 1337, 1341–42 (9th Cir.1981) (citations omitted). *See also Pan–Pacific & Low Ball Cable Television Co. v. Pacific Union Co.,* 987 F.2d 594, 596 (9th Cir.1993) (reaffirming and relying on *Bryant's* rule).[26] The rationale underlying the treatment of Rule 4(a)(3) as non-jurisdictional lies in the notion that the filing of the initial notice of appeal invokes the court's jurisdiction over the parties and the case and that, once this jurisdiction has been invoked, the court has the authority to fully adjudicate the appeal before it. This conclusion is in accord with the views of the Second, Fourth, and D.C. Circuits,[27] although the First, Third, Sixth, Seventh, and Tenth Circuits have reached the opposite result.[28]

has also used language suggesting the opposite conclusion. *Cf. Benson v. Armontrout,* 767 F.2d 454, 455 (8th Cir.1985). At the time that we decided *Bryant,* the Third Circuit had also followed this approach. *See Lucas v. Gulf & Western Indus., Inc.,* 666 F.2d 800, 805 (3d Cir.1981). Subsequently, it concluded that a reexamination of its position was warranted in light of the Supreme Court's decision in *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), which held that the requirement that parties be named in a notice of cross-appeal is jurisdictional and may be read as suggesting that all of the requirements of Federal Rules of Appellate Procedure 3 and 4 are jurisdictional. *See E.F. Operating Corp. v. American Bldgs.,* 993 F.2d 1046, 1049 n. 1 (3d Cir.1993) (concluding that *Torres* decision is probably applicable to notices of cross-appeal). However, *Torres* involved very different considerations from those involved when a party fails to file a notice of cross-appeal; in that case, the issue was whether the court could exercise jurisdiction over a party that was not named in any notice of appeal, a situation that is distinguishable from a case involving jurisdiction over particular claims or issues in a case in which the court has jurisdiction over all of the relevant parties. Since *Torres* was decided, we, along with the Second and D.C. Circuits, have reaffirmed our position that the notice of cross-appeal is a rule of practice rather than a jurisdictional requirement. *See Pan–Pacific,* 987 F.2d at 596; *see also Texport Oil Co.,* 11 F.3d at 366; *Spann,* 899 F.2d at 33.

**28.** *See Johnson v. Teamsters Local 559,* 102 F.3d 21, 29 (1st Cir.1996); *E.F. Operating Corp.,* 993 F.2d at 1049 n. 1; *Francis v. Clark*

In deciding whether to allow a cross-appeal that has not been properly noticed, courts have considered factors such as the interrelatedness of the issues on appeal and cross-appeal (particularly whether they involve the same parties), whether a notice of cross-appeal was merely late or not filed at all, whether the nature of the district court opinion should have put the appellee on notice of the need to file a cross-appeal, the extent of any prejudice to the appellant caused by the absence of notice, and—in a case involving certification of an interlocutory appeal— whether the scope of the issues that could be considered on appeal was clear. *See Texport Oil Co.,* 11 F.3d at 366; *Pan–Pacific,* 987 F.2d at 596; *Bryant,* 654 F.2d at 1342–43. In the instant case, the appellees have made the compelling argument that until the appellants filed their opening brief and raised the argument that the conspiracy ruling served as a *bar* to the district court's qualified immunity ruling, there was no necessity to challenge the conspiracy ruling on this appeal. Appel-

lees' failure to file a notice of cross-appeal within fourteen days of the appellants' notice of appeal is, therefore, understandable. At that time, appellees did not intend to press the conspiracy allegations as a basis for affirmance. It was only when appellants rested their argument in substantial part on the alleged inconsistency between the two rulings, and relied so heavily on the purported statements by the FBI agents, that the appellees felt compelled to challenge the conspiracy ruling on this interlocutory appeal.[29] Once the nature of the appellants' argument became clear, appellees assert, persuasively, it became necessary not only to dispute the claim that there was an inconsistency but also to argue that, if there was, the conspiracy ruling was erroneous and must be vacated. When appellants' brief was received, appellees then timely filed their brief in response squarely raising the issue: in fact, every "Issue[ ] Presented for Review" in that brief directly challenged the conspiracy ruling.[30] Weighing against

*Equip. Co.,* 993 F.2d 545, 552–53 (6th Cir. 1993); *Rollins v. Metro. Life Ins. Co.,* 912 F.2d 911, 917 (7th Cir.1990); *Savage v. Cache Valley Dairy Ass'n,* 737 F.2d 887 (10th Cir. 1984). While the Fifth Circuit has also followed the rule that a notice of cross-appeal is a jurisdictional requirement, *see Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 239 n. 2 (5th Cir.1990), it recently held that cases involving sua sponte dismissals under the PLRA are an exception to this rule, and allowed modification of the decision in a manner that benefitted the appellee despite appellee's failure to file a notice of cross-appeal. *See Marts v. Hines,* 117 F.3d 1504, 1506 (5th Cir.1997).

29. The brief contains two arguments: "I. The district court failed to fully apply the ruling in *Whiteley* and its progeny" and "II. The district court erred in its finding of materiality of certain facts in light of its decision that the Oakland defendants did not engage in a conspiracy or violate plaintiffs' 1st Amendment rights."

30. *See* Appellees' Brief at v:

1. Whether the court erred, where it dismissed the conspiracy charge against appellants for lack of evidence, in designating various issues arising from the evidence as "material"?

2. Whether the court erred, where it dismissed the conspiracy charge against appellants for lack of evidence, in failing to award them qualified immunity on grounds that anything they did or believed with respect to probable cause or the search warrant affidavits that might have been unreasonable, and otherwise not immune, was based on information received from "other law enforcement officials" (including but not limited to the FBI) upon which, since, as a matter of law, they were not involved in a conspiracy, they had a "right to rely" under *Whiteley v. Warden, Wyoming State Penitentiary?*

3. Whether the court erred in dismissing the conspiracy charge for lack of evidence?

4. Whether the plain error asserted in dismissal of the conspiracy charge, where it was in fact well supported by the evidence against appellants, is "inextricably intertwined" with the merits of their own claim of error on the issues of materiality and the right to rely, to the point where it must or should be corrected in this appeal?

5. Whether the court's error in dismissing the conspiracy against appellants and the resulting gross prejudice to plaintiffs can be remedied in this proceeding, in the absence of a previously perfected cross-appeal ... ?

the appellees, of course, is the fact that they failed to file a notice of cross-appeal once the appellants did file their opening brief. However, nothing could have made it clearer to the appellants than appellees' brief that they were actively seeking to have their cross-appeal heard, that they considered the issues "inextricably intertwined," and that they were seeking relief from any consequences of their failure to file the cross-appeal fourteen days after the appeal was filed. Moreover, a belated formal notice would have been untimely under the rules, and it would not have been clear to appellees whether this would be a proper procedural step.

■ Multiple reasons weigh in favor of exercising our jurisdiction over the cross-appeal in this case: the issues are inextricably interrelated, the parties involved are identical, and, although they did not choose to do so, the appellants were fully advised and had more than sufficient time to file a reply brief responding to the issues that the appellees sought to raise on cross-appeal.[31] There will be no prejudice to any party if we hear the cross-appeal. To the contrary, if we do not. do so, both parties may well be prejudiced by the delay. A major factor to consider in exercising our discretion is the interest in judicial efficiency. If we fail to decide the cross-appeal, regardless of who wins the case at trial, the appellees will have the right to a post-trial appeal of the district court's ruling on the conspiracy and First Amendment claims. If the appellees' post-trial appeal on these issues succeeds, a second trial will be required—which would not only be a tremendous waste of judicial resources but might require the parties to litigate the controversy with even fewer witnesses than will be available for the first trial. The events at issue in this case occurred in 1990; the litigation has been going on for over eight years; one of the two persons injured in the explosion has already died, not from the explosion but from the vagaries of human existence; and we are even now only considering the second interlocutory appeal. For these reasons, we exercise our discretion to decide the issues raised in the cross-appeal at this time.

## B.

## MERITS OF THE CROSS–APPEAL

### 1. The Required Showing

#### a. The First Amendment Claim

■ In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that "by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." *Sloman v. Tadlock,* 21 F.3d 1462, 1469 (9th Cir. 1994) (citing *Mendocino Env'l Ctr.,* 14 F.3d at 464). While this statement might be read to suggest that a plaintiff must demonstrate that his speech was actually inhibited or suppressed, our description of the elements of a First Amendment claim in *Mendocino,* which *Sloman* cited for its standard, requires only a demonstration that defendants *"intended* to interfere with Bari and Cherney's First Amendment rights." *Mendocino Env'l Ctr.,* 14 F.3d at 464 (emphasis added). Because it would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity, we conclude that the proper inquiry asks "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Crawford–El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996), *vacated on other grounds,* 520 U.S. 1273, 117 S.Ct. 2451, 138 L.Ed.2d 210 (1997) (internal quotation marks and citation omitted).[32]

■ Intent to inhibit speech, which "is an element of the claim," *Mendocino Env'l*

---

**31.** The appellees' brief, which raised the cross-appeal, was filed on June 5, 1998, ten months before oral argument. Appellants elected not to file the customary reply brief.

**32.** *See Bloch v. Ribar,* 156 F.3d 673, 681 (6th

*Ctr.*, 14 F.3d at 464, can be demonstrated either through direct or circumstantial evidence. *See Magana v. Commonwealth of N. Mariana Islands*, 107 F.3d 1436, 1448 (9th Cir.1997) (circumstantial evidence of intent is sufficient to survive summary judgment motion). For example, in *Hines v. Gomez*, 108 F.3d 265 (9th Cir.1997), we held that circumstantial evidence that an inmate had a reputation for filing grievances and had told a guard that he planned to file a grievance, combined with the jury's rejection of the guard's purported reason for punishing the inmate, "warrants the jury's finding that [the guard] filed the disciplinary report in retaliation for [the prisoner's] use of the grievance system." 108 F.3d at 268.

### b. The Conspiracy Claim

 To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of " 'an agreement or 'meeting of the minds' to violate constitutional rights.' " *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir.1989) (en banc) (quoting *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir.1983)). The defendants must have, "by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in damage." [33] *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir.1999) (quoting *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir.1990)). Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants. *See id.* at 856. For example, a showing that the alleged conspirators have committed acts that "are unlikely to have been undertaken without an agreement" may allow a jury to infer the existence of a conspiracy. *Kunik v. Racine County*, 946 F.2d 1574, 1580 (7th Cir.1991). Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, "so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached

Cir.1998) (plaintiff has stated retaliation claim by alleging that "adverse action caused them to suffer an injury that would chill people of ordinary firmness from continuing to engage in their constitutionally protected activity"); *Tatro v. Kervin*, 41 F.3d 9, 18 (1st Cir.1994) (plaintiff demonstrates First Amendment violation if an "officer's intent or desire to curb the expression was the determining or motivating factor in making the arrest"). *But cf. Connell v. Signoracci*, 153 F.3d 74, 79 (2d Cir.1998) (stating that demonstration that "the defendant's action effectively chilled the exercise of the plaintiff's First Amendment rights" is element of First Amendment claim); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir.1995) (dismissing plaintiff's claim in part based on failure to allege "any actual 'chilling' of his speech, or of his participation in the political process").

33. The plaintiffs have alleged that the defendants intended to " 'expose, disrupt, misdirect, discredit or otherwise neutralize' and otherwise suppress, punish and chill the protected activities of the plaintiffs, Earth First! and Redwood Summer," and defined the object of the conspiracy as follows:

[T]o 'expose, disrupt, misdirect, discredit or otherwise neutralize' and otherwise suppress, punish and chill the protected activities of the plaintiffs, Earth First! and Redwood Summer.

+ to endeavor to cause Redwood Summer to be seen and branded in the public mind as likely to involve lawless conflict and violence, so that its meaning and non-violent premise would be hidden and people would be frightened and discouraged from coming to participate;

+ to nurture the atmosphere of conflict, danger and division in the communities of the logging district and among the people there, so as to impede the organizing work of plaintiffs and their associates directed at the logging companies and their responsibility for the destruction of the forest and impoverishment of the forest workers; and,

+ to falsely portray plaintiffs and Earth First!, and cause them to be portrayed, as dangerous extremists, involved with bombs and guns and tree-spiking, willing to resort to violence, power-hungry and without conscience in the pursuit of their ends, etc. Plaintiffs' Seventh Amended Complaint at 15–16.

a understanding' to achieve the conspiracy's objectives." *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir.1979), *reversed in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980)) (quoting *Adickes v. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Phelps Dodge,* 865 F.2d at 1541.

## 2. The District Court's Conclusions

The district court found that the appellees had demonstrated that their First Amendment "advocacy was disrupted" by the actions of the appellants and the other defendants. It then held that the appellees had produced sufficient evidence that FBI agents had intended to inhibit their First Amendment activities, citing the showing that the FBI had previously investigated Earth First! and had misrepresented the nature of these prior investigations, had provided false or misleading information about the appellees to the Oakland police, and continued to investigate them even after the Alameda County District Attorney declined to pursue charges. However, the court reasoned that, because the appellees could not establish that the Oakland police had previously investigated Earth First!, had "engage[d] in any coverup," or had any animus toward them, they could not as a matter of law demonstrate that "the unlawful arrests and searches ... [were] motivated by an intent to chill plaintiffs' speech."

The district court's reasoning on the appellees' conspiracy allegation paralleled that relating to their First Amendment claims: it held that the appellees had presented circumstantial evidence suggesting animus and agreement among the FBI agents, but had failed to show that the appellants had any animus, intended to chill appellees' speech, or were part of the agreement to falsely accuse appellees of responsibility for the explosion.

## 3. Sufficiency of the Evidence Presented by the Appellees

■ Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action. *See Magana,* 107 F.3d at 1447; *Kunik,* 946 F.2d at 1580; *Hampton,* 600 F.2d at 620–21. Moreover, "[q]uestions involving a person's state of mind ... are generally factual issues inappropriate for resolution by summary judgment." *Braxton–Secret v. Robins Co.,* 769 F.2d 528, 531 (9th Cir.1985).

■ In the instant case, the appellees have presented sufficient circumstantial evidence that the appellants intended to inhibit their First Amendment activities, and that they entered a conspiracy to further this goal, to survive a motion for summary judgment. First, the fact that the appellants had themselves viewed the crime scene and the physical evidence raises a question as to whether they would have relied upon the FBI agents' questionable characterization of the evidence absent an improper motive or conspiracy. *See Phelps Dodge,* 865 F.2d at 1541 (police failure to exercise independent judgment may help demonstrate involvement in conspiracy). Second, some of the misinformation included in, and some of the material omissions from the search warrant affidavits were directly attributable to the appellants, which permits the inference of an improper motive for such conduct. Third, the appellants actively publicized the inaccurate information to the media, an act which is consistent with a desire to create a negative impression of Earth First! among the public. Fourth, the Oakland police department had a division that had monitored the activities of Earth First! and cooperated with the FBI prior to the bombing incident. Fifth, the Oakland police, in the search warrant affidavit, stated their belief that appellees were "members of a violent terrorist group." Such a statement strongly suggests that the officers

might have wanted to inhibit both the group's operations and the activities of its members. And finally, given the district court's findings of a factual dispute on the point, we must assume for purposes of this opinion that a conspiracy existed among FBI agents Doyle, Reikes, Sena, Buck, Hemje and Conway. The fact that the appellants acted in close cooperation with these "conspirators" in planning and conducting their investigation, and that both the FBI agents and the appellants contributed misinformation to the probable cause showings that allowed the appellants to obtain the search warrants, is highly probative as to the existence of an agreement, implicit or explicit, among the appellants and the FBI "conspirators". *See Phelps Dodge*, 865 F.2d at 1545, 1547 (characterizing the existence of a conspiracy as a "smoking gun" with regard to a plaintiff's attempt to prove that a particular defendant was part of that conspiracy).[34]

■ The possibility that other inferences could be drawn that would provide an alternate explanation for the appellants' actions does not entitle them to summary judgment. *See Phelps Dodge*, 865 F.2d at 1542 (inference need not be most likely but merely a "rational" or "reasonable" one); *Hampton*, 600 F.2d at 621 ("The fact that 'all of the evidence ... does not point in one direction and different inferences might reasonably be drawn from it' does not justify judicial intrusion into the jury's role in determining whether a civil conspiracy existed.") (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 700–01, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)). In other cases, we have al-

lowed similar circumstantial showings to withstand summary judgment motions. *See Phelps Dodge*, 865 F.2d at 1543, 1547 (company's powerful position and close relationship with law enforcement, meeting at which company urged police to treat plaintiffs harshly, inequitable treatment of plaintiffs by police, and active cooperation between company and police during strike was sufficient evidence of company's participation in conspiracy to withstand summary judgment).[35] *See also Bell v. City of Milwaukee*, 746 F.2d 1205, 1257–58 (7th Cir.1984) (defendants' adoption of modified version of events justifying police shooting without noting discrepancies with earlier story provided sufficient evidence of participation in conspiracy, despite absence of any evidence that defendants knew new version was false); *Myatt v. City of Chicago*, 816 F.Supp. 1259, 1268 (N.D.Ill.1992) (officer's presence during fellow officer's use of excessive force, warning to others to stay away, and retrieval of fellow officer's gun after it fell out of ankle holster raised inference of conspiracy that defeated summary judgment).

We therefore hold that the evidence is sufficient to raise a genuine issue of fact as to whether the appellants intended to interfere with the appellees' political activities and whether they did so by acting together with the FBI agents to falsely portray Bari and Cherney as being responsible for the explosion.

## IV.

## CONCLUSION

The district court's denial of summary judgment to appellants on the issue of

---

**34.** The fact that the Oakland police officers held meetings with and conducted a joint investigation with the FBI agents renders such evidence even more probative on the question of the involvement of the Oakland police officers. "The ability and opportunity to conspire, while insufficient alone, constitute circumstantial evidence of actual participation in the conspiracy." *Id.* at 1547.

**35.** *Fonda v. Gray*, 707 F.2d 435 (9th Cir. 1983), is not to the contrary. In that case, we held that a bank's acquiescence to the FBI's

investigation request was insufficient to prove its participation in the conspiracy. 707 F.2d at 438. However, the fact that the appellants in this case are law enforcement officials who were involved in a joint investigation with conspirator law enforcement officers clearly distinguishes it from *Fonda*, in which the defendants whose participation in the conspiracy was at issue were bank employees who demonstrated that they knew absolutely nothing about the nature of the FBI investigation. *Id.*

qualified immunity is AFFIRMED; its grant of summary judgment to appellants on the appellees' claims of First Amendment violations and conspiracy is REVERSED; and the case is REMANDED for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

SCHROEDER, Circuit Judge, concurring:

I concur in Judge Reinhardt's opinion. I write separately only to express my understanding that it holds that the cross-appeal is inextricably linked to the main appeal because the principal issue in the main appeal is whether the court's immunity ruling is inconsistent with the order that is the subject of the cross appeal. The two rulings should be reviewed together. There is no need to speculate about what the relationship between the issues might be after they are decided.